IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON



FILED

MAR - 5 2007

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

MARY J. WARD,

        Plaintiff,

V.                                       CIVIL ACTION NO. 3:05-0533

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## FINDINGS AND RECOMMENDATION

In this action, filed under the provisions of 42 U.S.C. §1383(c)(3), plaintiff seeks

review of the final decision of the Commissioner of Social Security denying her application for

supplemental security income based on disability.  The case is presently pending before the Court

on cross-motions of the parties for judgment on the pleadings.

Plaintiff filed her application on February 6, 2003, alleging disability as a

consequence of a nervous condition and headaches.   On appeal from an initial and reconsidered

denial, an administrative law judge, after hearing, found plaintiff not disabled in a decision which

became the final decision of the Commissioner when the Appeals Council denied a request for

review.  Thereafter, plaintiff filed this action seeking review of the Commissioner's decision.

At the time of the administrative decision, plaintiff was thirty-seven years of age and

had obtained a high school education.  She has no past relevant employment experience.   In his

decision, the administrative law judge determined that plaintiff suffers from "anxiety disorder, panic

disorder, major depressive disorder and borderline intellectual functioning," impairments he considered severe. Concluding that plaintiff retained the residual functional capacity for a limited range of work at all levels of exertion, and relying on Rule 204.00 of the medical-vocational guidelines[1] and the testimony of a vocational expert, the administrative law judge found her not disabled.

From a review of the record, it is apparent that the evidence, though conflicting, provides substantial support for the Commissioner's decision. Plaintiff reported her only physical problem was chronic headaches which she alleged occur every day. She indicated she had been prescribed medication for headaches, but she did not like to take pills, "so I don't take none [sic] of them."

The record reflects that plaintiff had a negative MRI of the head in November 2001, and her treating physician, Dr. McCann, reported on December 20, 2001, that her headaches were "completely controlled" with the medications Pamelor and Voltaren. On April 2, 2002, plaintiff complained that her headaches had returned; however, Dr. McCann noted she had stopped her medication because a psychiatrist had prescribed another medication and she had not told the psychiatrist about the medications she was already taking. Dr. McCann recommended plaintiff ask the psychiatrist if it was advisable to take all the medications together. On June 3, 2002, plaintiff was seen reporting daily headaches and indicating she was not taking the Pamelor prescribed by Dr. McCann. His report reflects he told her she could either take the medication and not have headaches or not take it and have them. Interestingly, three months later, plaintiff claimed she took the Pamelor and her headaches became worse. The diagnosis reflected headache disorder but it does not appear

---

[1] 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 4.

Dr. McCann prescribed any other therapy. Following a visit on June 23, 2003, when plaintiff reported light-headedness, Dr. McCann prescribed medication. When she was seen the following month, however, plaintiff reported she was still light-headed and denied taking any medication. Plaintiff's husband died in a drowning accident on August 1, 2003, and she testified she had not seen a doctor since that time, although she did see a therapist on August 20, 2003, and a psychiatrist on September 17, 2003. Finding that plaintiff's headaches were completely controlled with medication, a conclusion supported by her treating physician, the administrative law judge determined this was not a "severe" impairment and there was no indication of any physical condition which would limit her ability to work. This finding is well-supported by the evidence.

Plaintiff's most significant impairments are mental. In testimony, plaintiff stated she was too nervous and shaky to work. She claimed to have panic attacks two to three times a week, uncontrollable shaking, fears of storms and of the dark and an inability to accomplish daily activities. A November 25, 2001, psychiatric exam with Dr. Jack Dodd, arranged by the West Virginia Division of Rehabilitation Services, resulted in a diagnosis of generalized anxiety disorder and social anxiety disorder.

Plaintiff's treating physician referred her to Steven Cody, Ph.D., for evaluation on November 16, 2002, one year later. Plaintiff reported she had been prescried medication by Dr. Dodd but was not taking it. She also reported that the reason she had a sporadic work history was that she did not have a driver's license. While her rehabilitation counselor had tried to get her to take the driver's test, plaintiff would not, claiming she was too nervous. Plaintiff reported daily activities of cleaning house, putting away clothes, working on latch hook rugs and weekly attendance at

church.  Dr. Cody described her as pleasant with a bright affect and diagnosed anxiety disorder, NOS, and felt a generalized anxiety disorder should be ruled out.

The Commissioner sent plaintiff to Robert G. Martin, M.A., for a consultative evaluation on April 7, 2003.  Her allegations included episodes of shaking, chest pain and dizziness two times per day, lasting up to one hour each.  Her past treatment history included seven months of treatment by Dr. Dodd, consisting of medication and psychotherapy.  She was supposed to return to see Dr. Cody but could not make the second appointment and never followed up after that. Plaintiff listed her daily activities as visiting her mother, housework, playing video games, fixing dinner and then playing or talking with her children in the evening.  She is able to care for herself in terms of bathing, etc., and said she was able to do housework, although she asserted she had interference from headaches two to three times a week.  Her hobbies were said to be reading and playing video games and she related she attended church two times a week.  In terms of social interaction, plaintiff reported she is socially anxious and self-conscious and sometimes avoids social interaction.

Mental status evaluation revealed she was cooperative without an exaggerated or dramatic presentation.  No tremor was observed and her mood was described as anxious with range of affect mildly constricted.  Recent memory was moderately deficient based on WAIS-3 testing which also revealed borderline intellectual functioning.  Mr. Martin did note that plaintiff put forth good effort during testing, understood instructions, was persistent and maintained an acceptable pace.  The WRAT-3 test produced scores consistent with sixth grade reading and math abilities and seventh grade spelling ability.  This examiner diagnosed generalized anxiety disorder, panic disorder with mild agoraphobia, depressive disorder, NOS, and borderline intellectual functioning.

4

On April 23, 2003, a state agency psychologist who had reviewed the record expressed the opinion that plaintiff would be moderately limited in the areas of understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; traveling in unfamiliar places or using public transportation; and, setting realistic goals or making plans independently of others. It was this reviewer's opinion that plaintiff should be able to perform routine one and two-step tasks in a low stress work setting. This assessment was affirmed by a second state agency psychologist on July 29, 2003.

Plaintiff returned to treatment with Dr. Cody and Tracy LeGrow, M.A., on June 4, 2003, with complaints of increased shakiness and anxiety which were interfering with her ability to perform daily activities. She reported poor sleep and that she heard voices and saw things at night that were not there. On July 6, 2003, she reported to her therapist she had gone fishing just to do something for herself. At the August 20, 2003, appointment, plaintiff reported her husband's death and noted she had many worries, especially about her finances. There were no diagnoses contained in these reports. At the most recent visit, on September 17, 2003, plaintiff was seen by a psychiatrist, Dr. Anthony Park. She reported that prescribed medication had caused drowsiness and she had stopped taking it. Exam revealed she was withdrawn, quiet and guarded with a depressed mood and

significantly constricted affect. Her psychomotor activity was "significantly retarded." Memory was intact and hallucinations were denied. The diagnosis was panic disorder with agoraphobia and major depressive disorder, recurrent, severe. Plaintiff's Global Assessment of Functioning ("GAF") was rated at fifty-five to sixty, consistent with moderate symptoms or moderate difficulty with social or occupational functioning.[2]

The administrative law judge determined that plaintiff's anxiety, depression and borderline intellectual functioning were "severe" impairments but that they did not meet or equal a listed impairment(s). Clearly, plaintiff's I.Q. scores, all above seventy, do not meet the requirements of any of the subsections under Listing 12.05. With regard to Sections 12.04 and 12.06, the administrative law judge found plaintiff's depressive and anxiety disorders met the criteria under Sections 12.04A and 12.06A, but concluded that she did not have the degree of restriction of activities of daily living, social functioning and/or concentration, persistence and pace to meet the "B" criteria of these listings. The evidence, which does reflect some limitation, clearly supports the determination of the administrative law judge that plaintiff had no more than moderate limitation in any of these areas. Despite plaintiff's argument to the contrary, she did not, therefore, meet or equal a listed impairment.

As to residual functional capacity, the administrative law judge, after considering the observations documented by examining and treating physicians, found that plaintiff's mental impairments were not disabling but would result in moderate limitations in those areas found by the state agency medical advisors in their assessments. While plaintiff argues that these assessments

_____

[2] See, Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., American Psychiatric Association, 1994 at 3.

should not be relied upon because they were completed prior to the submission of the treatment notes from Tracy LeGrow and Dr. Steven Cody, there do not appear to be any findings in those reports which would establish additional limitations due to mental impairments. Plaintiff was understandably negatively affected by her husband's tragic death in August of 2003, but Dr. Park's psychiatric exam the following month led him to conclude that she had a GAF of fifty-five to sixty, as noted, consistent with moderate symptoms or moderate "difficulty" with social, occupational or school functioning.[3] This level of symptom severity or impairment in functioning is consistent with the moderate limitations the administrative law judge ultimately found. The Court concludes, therefore, that the administrative law judge's reliance on the earlier opinions of the state agency medical advisors was not error under these circumstances. The Court also finds the administrative law judge's assessment of plaintiff's residual functional capacity is supported by substantial evidence.

While plaintiff complains of significant limitations on her functioning mainly due to mental impairments, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, concluded that her testimony was not entirely credible. Persuasive to him were the clinical findings which did not reflect more than moderate severity of symptoms and disorders as well as plaintiff's noncompliance with treatment. The administrative law judge noted that the medical reports show that she failed to follow through with appointments and to take prescribed medication, even though she acknowledged that these treatments helped relieve her symptoms. Plaintiff testified she had a fear of taking pills; however, this fear did not seem to apply to all medication she was prescribed, as the administrative law judge found. Further, while

---

[3] See, DSM, supra.

plaintiff asserts that she was not compliant because she experienced borderline intellectual functioning, poor judgment and limited insight, this is not persuasive. First, plaintiff cites to Robert Martin's evaluation for the proposition that she has poor judgment; however, this evaluator found her judgment to be intact and further concluded her thinking was lucid and there was no evidence of a thought disorder. She also understood test directions without difficulty. Further, the doctors did not note that she did not understand prescription directions. As noted, Dr. McCann specifically discussed with her the importance of taking medication for her headaches. She clearly displayed sufficient awareness and understanding in other areas to have known what she was supposed to do and why. In view of the evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

Finally, in response to hypothetical questioning which included plaintiff's age, education, work experience and a reasonably accurate profile of her functional capacity and overall medical condition, a vocational expert testified that there were significant numbers of heavy, medium, light and sedentary jobs in the national economy which she could perform. While plaintiff alleges that the vocational expert's testimony cannot be relied upon because it conflicts with the Dictionary of Occupational Titles ("DOT"), the Court finds this argument unpersuasive. The regulation at 20 C.F.R. §416.966(d) provides that, when determining whether unskilled work exists for a client who can no longer perform past work, the Commissioner will take administrative notice of job information available from "various governmental and other publications." Examples include the DOT, county business patterns, census reports, occupational analyses and occupational outlook

handbooks.   The regulation cites these as examples and does not indicate they are the only publications the Commissioner would consider.

In accordance with Social Security Ruling ("SSR") 00-4p, the administrative law judge asked the vocational expert if her testimony was consistent with the DOT, and she replied that it was.  When asked by plaintiff's representative for DOT numbers corresponding to the jobs cited, this witness noted that, in coming up with jobs that fit the hypothetical limitations, she also used a book called "Specific Occupational Selector" which she stated groups jobs together by census code. She gave both the code for the jobs from this book and from the DOT and explained why she felt it was necessary to cite from both sources since the DOT numbers referenced just one job, which this witness felt was too limiting, while the other book gives a group listing of other jobs in the same category.  The administrative law judge accepted her testimony and, as noted, relied on it in finding there were other jobs plaintiff could perform.

Although plaintiff filed a brief prior to the time the administrative law judge reached his decision, she did not mention the alleged conflict in the  vocational expert's testimony, even though she faults him for not addressing her arguments.  Instead, this issue is raised here for the first time.  The Court does not perceive a problem with the  vocational expert using more than the DOT to compile her statistics.  The regulation specifies that the Commissioner will take administrative notice of reliable job information from "various" sources as noted.  It appears that by doing this the vocational expert was trying to be more rather than less accurate about the kinds of jobs plaintiff could perform.

Plaintiff, in her brief to the Court, has also set forth the DOT characteristics of the jobs cited by the  vocational expert and alleges they are not consistent with the assumptions in the

9

hypothetical questions, mainly on the basis that either the specific vocational preparation ("SVP") rating was greater than that indicated for unskilled jobs and/or the components found in the general educational development ("GED") ratings, which consist of reasoning, math and language skills, are too high. The Court, being without vocational expertise, will not attempt to determine whether there are aspects of these jobs which might be inconsistent with the hypothetical questions. This issue should have been presented to the Commissioner to resolve. Given the vocational expert's testimony that the jobs she cited are not just from the DOT, however, clearly a job could not be found inappropriate based solely on criteria from this one source. The Court thus concludes that the administrative law judge's decision is supported by substantial evidence, including the vocational expert's testimony, and should be affirmed.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments and residual functional capacity. Under such circumstances, the decision of the Commissioner should be affirmed.

10

## RECOMMENDATION

In light of the foregoing, it is **RESPECTFULLY RECOMMENDED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner affirmed.

Plaintiff and defendant are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Robert C. Chambers, United States District Judge, and that, in accordance with the provisions of Rule 72(b), Fed.R.Civ.P., the parties may, within thirteen days of the date of filing these Findings and Recommendation, serve and file written objections with the Clerk of this Court, identifying the portions of the Findings and Recommendation to which objection is made and the basis for such objection. The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. §636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation. Copies of objections shall be served on all parties with copies of the same to Judge Chambers and this Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to all counsel of record.

DATED:  March 5, 2007

11